Jason R. Hull [11202]
jhull@mohtrial.com
Trevor C. Lang [14232]
tlang@mohtrial.com
**Marshall Olson & Hull, pc**
Newhouse Building
Ten Exchange Place, Suite 350
Salt Lake City, Utah 84111
Telephone: 801.456.7655

Kelly A. Hyman
[Pro Hac Vice Forthcoming]
hymank@fdazar.com
**Franklin D. Azar and Associates, pc**
14426 East Evans Ave
Aurora, CO 80014
Telephone: 303.757.3300

Jeffrey Kaliel [Pro Hac Vice Forthcoming]
Jkaliel@kalielpllc.com
Sophia Gold [Pro Hac Vice Forthcoming]
sgold@kalielpllc.com
**Kaliel, pllc**
1875 Connecticut Avenue NW, 10th Floor
Washington, DC 20009
Telephone: 202.250.4783

Attorneys For Plaintiff and
Proposed Class Counsel

### IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CHAS BEAMAN, an individual on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>MOUNTAIN AMERICA FEDERAL CREDIT UNION dba MOUNTAIN AMERICA CREDIT UNION, a Federal Credit Union,<br><br>    Defendant. | **COMPLAINT**<br><br>**[PROPOSED CLASS ACTION]**<br><br>JURY TRIAL DEMANDED<br><br><br>Case No.: 1:19-cv-00053-PMW<br><br>Judge Paul M. Warner |

Plaintiff, Chas Beaman ("Mr. Beaman"), individually and on behalf of the classes of persons preliminarily defined below, makes the following allegations based upon information

and belief, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiff bring this action on behalf of himself and the class of all similarly situated consumers against Defendant, Mountain America Federal Credit Union ("MACU"), arising from its routine practice of assessing overdraft fees ("OD Fees") on debit card transactions that did not actually overdraw a checking account.

2. MACU misleadingly and deceptively misrepresents this practice, including its own account contracts.

3. MACU also omits material facts pertaining to this practice, including its account contracts.

4. This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief.

5. As described herein, MACU's practices violate MACU's own form contracts.

6. MACU's improper scheme to extract funds from accountholders has victimized Mr. Beaman and thousands of other accountholders. Unless enjoined, MACU will continue to engage in these schemes and cause substantial injury to accountholders.

## PARTIES

7. Mr. Beaman is an individual and resident of Weber County, Utah.

8. MACU is a federally regulated credit union with its principal place of business located in Salt Lake County, Utah.

## JURISDICTION AND VENUE

9. This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed class is comprised of at least 100 members; (2) proposed class members reside in states outside of Utah; and (3) the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because MACU is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## BACKGROUND FACTS

*MACU Charges OD Fees on Transactions That do not Actually Overdraw the Account*

**A.     Overview of Claim.**

11. Mr. Beaman brings this cause of action challenging MACU's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions," or "APPSN Transactions."

12. Under a MACU debit card, at the moment debit card transactions are authorized on an account with positive funds to cover the transaction, MACU immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the consumer's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient

available funds available to cover these transactions because MACU has already sequestered these funds for payment.

13. However, MACU still assesses crippling $25 OD Fees on many of these transactions and mispresents its practices in its account documents.

14. Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, MACU later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN Transactions.

15. MACU maintains a running account balance in real time, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, MACU sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

16. That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

17. Still, despite keeping those held funds off-limits for other transactions, MACU improperly charges OD Fees on those APPSN Transactions, although the APPSN Transactions *always* have sufficient available funds to be covered.

18. Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

19. There is no justification for these practices, other than to maximize MACU's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But MACU is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does

the latter to the tune of millions of dollars each year. But MACU was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

20. Besides being deceptive, unfair, and unconscionable, these practices breach contract promises made in MACU's adhesion contracts—contracts which fundamentally misconstrue and mislead consumers about the true nature of MACU's processes and practices. These practices also exploit contractual discretion to gouge consumers.

21. In plain, clear, and simple language, the checking account contract documents covering OD Fees promise that MACU will only charge OD Fees on transactions that have insufficient funds to cover that transaction.

22. In short, MACU is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account. Regardless, it does so and continues to do so.

**B.   Mechanics of a Debit Card Transaction.**

23. A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from MACU. When a merchant physically or virtually "swipes" a customer's debit card, the card terminal connects, via an intermediary, to MACU, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

24. At this step, if the transaction is approved, MACU immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

25. Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as

discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 25, 2009).

26. Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

27. There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

### C.     MACU's Account Contract.

28. Mr. Beaman has a MACU checking account, which is currently governed by MACU's standardized "Membership Agreement" document (the "Deposit Agreement").

29. The relevant contract documents covering OD Fees provide that MACU will not charge OD Fees on transactions that have sufficient funds to cover them at the time they are initiated:

> An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway.

Overdraft Disclosure, Ex. 1.

30. For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to "cover" those transactions—yet MACU assesses OD Fees on them anyway.

31. The above promises indicate that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN transactions.

32. In fact, MACU actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions. Instead, it uses the secret posting process described below.

33. No express language in any document states that MACU may impose OD Fees on any APPSN Transactions.

34. The account documents misconstrue MACU's true debit card processing and overdraft practices.

35. MACU assesses OD Fees on APPSN Transactions that *do* have sufficient funds available to "cover" them throughout their lifecycle.

36. MACU's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between MACU's actual practice and the contract causes consumers like Mr. Beaman to incur more OD Fees than they should.

D.   **MACU Abuses Contractual Discretion.**

37. MACU's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous account documents. In addition, MACU exploits

contractual discretion to the detriment of accountholders when it uses these policies.

38. The term "to cover" is not specifically defined. MACU uses its discretion to define the term in a manner contrary to any reasonable, common sense understanding of that term. In MACU's implied definition, there are insufficient funds "to cover" a transaction, even though MACU sequesters sufficient available funds for that transaction at the time it is made.

39. Moreover, MACU uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

40. MACU uses these contractual discretion points unfairly to extract OD Fees on transactions that no reasonable consumer would believe could cause OD Fees.

E. **Reasonable Consumers Understand Debit Card Transactions are Debited Immediately.**

41. The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

42. MACU was and is aware that this is precisely how accountholders reasonably understand debit card transactions to work.

43. MACU knows that many consumers prefer debit cards for these very reasons. Consumer research indicates that consumers prefer debit cards as a budgeting device because

they do not allow debt like credit cards do, and because the money comes directly out of a checking account.

44. Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *See* http://www.consumeraction.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card (last visited March 7, 2019).

45. Further, Consumer Action informs consumers that "[d]ebit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *See* https://www.consumer-action.org/english/articles/understanding_debit_cards (last visited March 7, 2019).

46. That is a large part of the reason that debit cards have risen in popularity. In 2016, the number of terminals that accept debit cards in the United States had increased by approximately 1.4 million compared to 2011, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM."[1]

---

[1] Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23 (last visited March 7, 2019).

47. Not only have consumers increasingly switched from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

48. MACU was aware of a consumer perception that debit card transactions reduce an available balance *in a specified order*—namely, the moment they are actually initiated—and its account agreement only supports this perception.

### F. Plaintiff Beaman's Debit Card Transactions.

49. On April 24, 2019, Mr. Beaman was assessed an OD Fee in the amount of $25.00 for a debit card transaction that settled that day. However, that transaction was initiated and authorized into a <u>positive</u> account balance on the day prior. Further, at that time of authorization, positive funds were deducted immediately for the debit card transaction on which he was later assessed an OD Fee.

## CLASS ACTION ALLEGATIONS

50. <u>Definition of the Class</u>: Plaintiff brings this class action on behalf of himself and the class of persons ("the Class") defined as follows:

> All MACU accountholders who, during the applicable statute of limitations, were charged OD Fees on debit card transactions that that were authorized into a positive available balance.

51. Excluded from the Class are MACU's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns. Also excluded from the Class are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

52. The time period for each of the Class is the number of years immediately preceding the date on which this Complaint was filed as allowed by the applicable statute of limitations, going forward into the future until such time as MACU remedies the conduct complained of herein.

53. <u>Numerosity</u>:  The members of the proposed Class are so numerous that individual joinder of all members is impracticable.  The exact number and identities of the members of the proposed Class are unknown at this time and can be ascertained only through appropriate discovery.  It is estimated that there are thousands of members in the Class.

54. <u>Common Questions of Law and Fact Predominate</u>:  There are many questions of law and fact common to Mr. Beaman and the Class, and those questions substantially predominate over any questions that may affect individual Class members.  Common questions of law and fact include whether:

    A. Whether MACU charged OD Fees on transactions that were authorized into a positive available balance;

    B. Whether MACU breached its own contract by charging OD Fees on transactions that were authorized into a positive available balance;

    C. Whether MACU breached the covenant of good faith and fair dealing;

    D. The proper method or methods by which to measure damages; and

    E. The declaratory and injunctive relief to which the Class is entitled.

55. <u>Typicality</u>:  Mr. Beaman's claims are typical of the claims of the members of the Class.  Mr. Beaman and all members of the Class have been similarly affected by the actions of MACU.

56.     <u>Adequacy of Representation</u>:  Mr. Beaman will fairly and adequately represent and protect the interests of the Class.  Mr. Beaman has retained counsel with substantial experience in prosecuting complex and consumer class action litigation.  Mr. Beaman and his counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so.

57.     <u>Superiority of Class Action</u>:  Mr. Beaman and the members of the Class suffered, and will continue to suffer, harm as a result of MACU's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of the Class is impractical.  Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by MACU's common course of conduct.  The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum.  The conduct of this action as a class action conserves the resources of the parties and of the judicial system and protects the rights of the Class members.

58.     <u>Risk of Inconsistent or Varying Adjudication</u>:  Class action treatment is proper, and this action should be maintained as a class action because the risks of separate actions by individual members of the Class would create a risk of:  (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for MACU as the party opposing the Class; and/or (b) adjudications with respect to individual Class members

would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impeded their ability to protect their interests.

59.   <u>Action Generally Applicable to Class as a Whole</u>:  MACU, as the party opposing the Class, has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**FIRST CLAIM FOR RELIEF**

**<u>Breach of Contract, Including the Covenant of Good Faith and Fair Dealing</u>**

[ON BEHALF OF PLAINTIFF AND THE CLASS]

60.   Mr. Beaman incorporates by reference the preceding paragraphs.

61.   Mr. Beaman and MACU have contracted for banking services, as embodied in the MACU's account documents and related documentation.

62.   All contracts entered by Mr. Beaman and the Class are identical or substantively identical because MACU's form contracts were used uniformly.

63.   MACU has breached the express terms of its own agreements as described herein.

64.   Under the law of Utah, good faith is an element of every contract.  All contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

65. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

66. MACU abused the discretion it granted to itself when it charged OD Fees on transactions that were authorized into a positive available balance.

67. In these and other ways MACU violated the covenant of good faith and fair dealing.

68. MACU willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing revenue from Plaintiff and other members of the Class.

69. Mr. Beaman and members of the Class have performed all, or substantially all, of the obligations imposed on them under the banking agreements.

70. Mr. Beaman and members of the Class have sustained damages as a result of MACU's breaches of the parties' contracts and breaches of contract through violations of the covenant of good faith and fair dealing.

71. Mr. Beaman and members of the Class are entitled to recover damages in an amount to be determined at trial.

72. Plaintiff and members of the Class have no adequate remedy at law and are entitled to injunctive relief against further breaches by MACU.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Beaman on his own behalf and on behalf of the Class respectfully request that the Court:

(a) Certify this case as a class action pursuant to Rule 23, designating Plaintiff as named representative of the Class, and designating the undersigned as Class Counsel;

(b) Award Mr. Beaman and the Class actual, incidental, and consequential damages in an amount to be proven at trial, including any and all compensatory damages, punitive damages, restitution, any applicable penalties and interest, authorized attorneys' fees, interest, and costs, and any further relief as the Court deems just equitable, and proper;

(c) Declare MACU's practices outlined herein to be unlawful;

(d) Enjoin MACU from engaging in the practices outlined herein;

(e) Grant Plaintiff and the Class a trial by jury; and

(f) Granting such other relief as the Court deems just and proper.

DATED this 31st day of May, 2019.

**MARSHALL OLSON & HULL, PC**

BY: /s/ Jason R. Hull
JASON R. HULL
TREVOR C. LANG

**KALIEL PLLC**
JEFFREY KALIEL
SOPHIA GOLD

**FRANKLIN D. AZAR AND ASSOCIATES, PC**
KELLY A. HYMAN

ATTORNEYS FOR PLAINTIFF AND
PROPOSED CLASS COUNSEL